THE PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* JOHN FERGUSON *v.* THE BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO.

STATUTORY CONSTRUCTION.—In construing a statute all parts of the Act must be considered, in order to ascertain from the whole what was the real intent of the Legislature.

IDEM.—Legislative Acts compelling municipal bodies to make improvements of a local character may not only be passed, but will receive as liberal a construction as other Acts.

IDEM—If an Act is unwise in its character, Courts have no power to remedy the grievance.

THE TITLE OF AN ACT.—The title of an Act, in cases of doubt, may be referred to as tending to elucidate the intent of the Legislature, but it is never permitted to . control the body of the Act.

WHEN STATUTE IS MANDATORY.—Although it may appear from the first section of an Act that it was not intended to be mandatory, yet if the other provisions of the Act are wholly inconsistent with this hypothesis, the Act will be held to be mandatory.

IDEM.—An Act which provides that it shall be the duty of the Board of Supervisors, within a certain time, to proceed and let a contract for a local improvement, and prescribes what the improvement shall be, leaving nothing to the discretion of the Board, is mandatory on the Board.

CONSTRUING ACT AS MANDATORY.—If an Act commands a municipal body to proceed and grade a certain street, prescribing the way and manner of doing the same, and the grade to be adopted, and leaving nothing to the discretion of the municipal body except certain incidents to the main work, Courts will not construe the Act as not mandatory because these incidents are left to the discretion of the body.

PLAINTIFF IN MANDAMUS.—An application for a writ of mandate to compel the performance of some Act in which a large number of individuals are interested, which is made in the name of the People, and is not signed by the Attorney General, but by an attorney of the relator, will not be dismissed because not made in the name of some one interested, if the Attorney General unites in the brief in support of the application.

APPLICATION to the Supreme Court for writ of mandate.

The facts are stated in the opinion of the Court.

*Jo Hamilton, Attorney General,* and *Wilson & Crittenden,* for Applicant.

Section one is not only *pro tanto* an enabling Act, but it actually establishes the grade. It gives full power to the Board to modify the grade of the streets named, and defines precisely what the new grade shall be.

Section two provides for a work necessary and consequent upon the grade defined in section one; that is, the building of a bridge, steps, etc.

Section three relates to the expenses of the work generally, and refers to the other provisions of the Act for details.

Section four defines the district of the city affected by the work, for the purposes of ascertaining the damages and benefits immediately resulting from the work and for the proper assessments.

So far in the Act we have, first, a precise designation of the work to be done; second, a means provided for the payment of expenses and damages; and third, a power in the Board to execute the work. In a word, it may be considered a bald grant of power to do a well defined work, leaving nothing to the discretion of the Board as to what is to be done, or the mode of doing it. Still, from this grant of power alone, connected as it is with so particular a detail of what should be done, it might well be contended that a duty was imposed on the Board to do the work. It could not be denied that the Legislature had itself determined upon the expediency and propriety of the improvement, according to plans and specifications of its own framing, and that nothing was left to the subordinate local government but a speedy compliance with the orders and instructions of the superior. The only plausible argument that could be urged against the mandatory character of the Act, if nothing occurred after section four to aid the construction, would be, that as no time was specified within which the work was to

be commenced, a discrotion was necessarily left in the Board to say at what time the public interest demanded the performance of the work.

But section five supplies the answer to this view. The full power being supplied by the previous enabling sections, section five expressly provides for the time and manner of the exercise of that power. With unmistakable intention, the positive mandate is given: "It shall be the duty of the Board of Supervisors, within thirty days after the passage of this Act, to cause notice of the proposed work" to be given, and "sealed proposals" invited, in the manner particularly directed in that section.

In this section no discretion is left to the Board—nothing upon which its judgment is to act—nothing of expediency for it to determine. A simple, plain duty is created, and the precise time named within which that duty is to be performed.

The Act is really simple, plain, and comprehensive. By analysis, it unavoidably and manifestly is resolved into four distinct parts, viz: First—It defines the work to be done. Second—It gives the Board the power to do it. Third—It specifies in detail the manner in which the power is to be executed. Fourth—It makes it the duty of the Board to execute it.

If this be correct, it necessarily follows that the Act is mandatory upon the Board of Supervisors, and must be obeyed. What can be said in favor of a construction that it is not mandatory? Had the matter been left to the discretion of the Board the language of section five would have been very different. It would have been, that whenever the Board determines to modify the grades of said streets, it shall cause notice to be published, etc.

There can be no doubt of the power of the Legislature to pass an Act of this kind, and make it mandatory upon the Board of Supervisors. "So far as municipal corporations are invested with subordinate legislative powers for local purposes, they are mere instrumentalities of the State, for

the convenient administration of the government; and their powers are under the entire control of the Legislature, and they may be qualified, enlarged, restricted, or withdrawn, at its discretion.". (See *Grogan* v. *San Francisco*, 18 Cal. 613; *McCracken* v. *San Francisco*, 16 Cal. 621; *Payne et al.* v. *Treadwell*, 16 Cal. 233; *People* v. *Morris*, 13 Wend. 337; *East Hartford* v. *Hartford Bridge Company*, 10 How. 534; *People* v. *Common Council of Brooklyn*, 22 Barb. 412.)

*John B. Felton*, and *Horace M. Hastings*, for Respondent.

The work provided for is the change of the present official grade of a certain street. It is a work altogether municipal in its character, in nowise affecting the general interests of the State; and there can hardly be a reason suggested why the representatives of the different counties of the State should have taken it upon themselves to arbitrarily order the City of San Francisco to modify a certain grade upon one of its own streets.

The Act provides for purely local improvement. It designates a certain restricted limit of the City of San Francisco as the part to be affected, beneficially or injuriously. In section four of the Act it is provided that "the district affected by the work designated in this Act is herein defined as that line within and upon the line of Second street, between Market and the Bay of San Francisco," etc.

Here is a legislative declaration: First—That the State is not affected by this work. Second—That it is so entirely of a local character that only a small portion of the City of San Francisco is affected by it. And yet it is gravely contended that in violation, as we shall hereafter show, of the natural meaning of the language of the Act, the State at large has ordered imperatively that this work shall be done without giving any opportunity to those whom it declares to be the sole persons interested in the work to be heard in the matter.

Now, turning to the construction of the Act, as indicated

by the language, we have in the first place the title of the Act, which is: "An Act to authorize the Board of Supervisors of the City and County of San Francisco to modify the grades of certain streets." It is a well known principle of construction that, although the title of the Act is no part of the Act, yet, since it expresses the purpose and object of the Act, it may be called in for the purpose of construing it. Especially should this be the case in California, where the Constitution itself provides that every Act shall have but one subject matter, and that shall be expressed in the title. The first section of the Act is unambiguous. It confers a power, but not one word in this section implies that a duty is rendered obligatory.

The brief on the part of the applicant would seem to proceed on the ground that wherever a Board is authorized to do an act, and afterwards language in its character imperative is used, that no discretion is left with the Board. We submit to the Court that this is not the rule of construction. Every Act is to be judged precisely as a power of attorney would be so as to ascertain the true meaning of the Legislature. The language of the Act in the case of *Bowers* v. *The Board of Supervisors of Sonoma County*, 32 Cal. 66, was absolutely imperative in its terms, and yet the Court held it to be discretionary in its terms.

The writ "is not applicable as a redress for mere private wrongs." (Tapping on Mandamus, p. 5; 4 B. & C. 901; 1 W. Black. 61; Str. 536; 1 Wils. 283.)

If the people are interested, the application should have been made by the Attorney General, whose name does not appear upon the record, nor does it appear that any one has been delegated by him to appear for the people. (*People* v. *Pacheco*, 29 Cal. 213.)

By the Court, Crockett, J.:

This is an application for a mandamus to compel the Board of Supervisors of the City and County of San Francisco to proceed with the work of altering the grade of Second street, between Howard and Bryant streets, in said city, in pursuance of the provisions of the Act of the Legislature of March 30th, 1868. (Stats. 1867–8, p. 594.)

There is but one question of any practical importance involved in the case, to wit: whether the Act of the Legislature is simply an enabling Act, authorizing the Board of Supervisors to perform the contemplated work, if it shall see fit to do it, but leaving the Board the right to exercise its discretion in the premises; or whether the Act is mandatory in its terms, leaving in the Board no power to decline to proceed with the work.

The title of the Act is "An Act to authorize the Board of Supervisors of the City and County of San Francisco to modify the grades of certain streets;" and the first section provides that "the Board are hereby authorized to modify the grade of Second street, between Howard and Bryant streets, in such manner that the crossing of Folsom and Second streets shall be forty-two feet above the base lines of the city grades, and that the crossing of Harrison and Second streets shall be fifty feet above the said base line," etc. It will be observed that both in the title and the first section the term "*authorized*" is employed, which imports only that the Board may or may not, at its discretion, cause the work to be done. But in construing statutes, the universal rule is that all parts of the statute must be considered, in order to ascertain from the whole what was the real intent of the Legislature; and the sole province of the Court is to give effect to that intent when thus ascertained.

The argument for the respondents is: First—That it would be a most extraordinary proceeding for the Legislature to undertake, by a mandatory Act, to *compel* a local improvement of this character to be made, whether those interested

desired it or not; and that such a construction ought not to be given to the Act, unless its terms imperatively require it. Second—That the title and the first section of the Act render it apparent that the Board was only *authorized,* but not *commanded,* to cause the work to be performed. Third—That by the second section of the Act, it is provided that at the crossing of Harrison street over the lines of Second street, there shall be a wooden bridge, with the stairways leading down to Second street, and that the bridge and stairways " shall be built and constructed as shall be provided by said Board of Supervisors;" and it is insisted that inasmuch as the bridge and stairways are necessary parts of the work, in respect to the particular method of constructing which the Board is to exercise its discretion, and about the details of which a majority of the Board may possibly never agree, it results that the Board cannot be compelled to undertake the work at all.

On the first proposition, we have only to say that it is not our province to discuss the expediency or wisdom of a legislative Act. Our sole duty is, by applying just rules of construction to ascertain the true intent of the Legislature, and carry it into effect. If the Act is unwise or oppressive in its provisions, the fault is with the Legislature, and we have no power to remedy the grievance. But legislation of this character is not so entirely without a precedent in this State as to justify the rigid rule of construction invoked by the counsel. In numerous instances the Legislature has commanded municipal bodies to perform acts of a purely local nature, and affecting only the interests of small portions of the community. Indeed, municipal corporations are but the creatures of the Legislature, and intended to aid the legislative branch of the Government in the administration of local affairs. It may not be wise or politic in the Legislature to do directly what, perhaps, might be better done through the instrumentality of municipal corporations. But this is

76

an argument to be addressed to the Legislature, and not to the Courts.

The next proposition is, that from the title and first section of the Act it is evident the intention was to leave it discretionary with the Board whether to cause the work to be performed or not.   If the solution of the question under discussion depended solely on the title and first section of the Act, we should hold, without hesitation, that the Act is not mandatory, and that the Board might proceed with the work or not, at its discretion.   But though the title of an Act, in cases of great doubt, may be referred to as tending to elucidate the intent of the Legislature, it is never permitted to control the body of the Act.   In *People* v. *Abbott*, 16 Cal. 365, the rule is thus stated: "Where the meaning of the body of the Act is doubtful, the title may be relied on as an assistance in arriving at a conclusion.   Of course, it cannot be used for the purpose of restraining or controlling any positive provision of the Act; but in cases of doubt, is frequently resorted to as a means of ascertaining the intention of the Legislature."   "Taken," says Sedgwick, "in connection with other parts of the statute, it may, where the intent is not plain, assist in removing ambiguities."

But if the first section stood alone, and without the aid of the title, it would be sufficient to show that the Act was not intended to be mandatory, unless there was something in other portions of the Act to overcome this presumption and to establish a contrary intent.   In our opinion, other provisions of the Act are wholly inconsistent with the hypothesis that the Board was to exercise any discretion whatever in the premises, except a very limited discretion as to the particular method to be employed in the construction of the bridge and stairways.   The Act prescribes with great minuteness the exact elevation of the new grades at the crossings; the general character of the bridge and stairways; the precise district to be benefited by the improvement; and provides how bids for the work are to be made and accepted; how the contract is to be entered into; how the damages and

benefits are to be assessed and collected, and the former paid. In fact, it leaves nothing of any practical importance for the Board to do, except to carry into execution the provisions of the Act. If it had been intended to leave it optional with the Board whether or not the work should be performed, it is not in the least degree probable that they would have been denied the power to exercise any discretion whatever in respect to the principal details of the improvement. To hold that the Board was authorized to decline to make the improvement, if it elected so to do, but if it decided to proceed with it, then that the grades must be of a particular elevation, the bridge of specified dimensions, resting on abutments "of uniform height with Harrison street," the stairs of a particular width, the contract for the work to be entered into in a particular manner, (the district to be benefited being specified in the Act itself,) would be to impute to the Legislature an inconsistency of conduct nearly akin to an absurdity. It is scarcely credible that the Legislature would deny to the Board the right to exercise any discretion whatever as to these details, and yet confer on it the power to defeat the improvement altogether. The fact that the most minute details of the work are specified, *ex industria,* tends strongly to prove that the Board was to exercise little or no discretion in respect to the manner of doing the work, and much less can we infer that it was intended to confer on them the power to defeat it entirely. But if the other provisions of the Act left a doubt on this point, it would be removed by section five, which provides that "it shall be the duty of the Board of Supervisors, within thirty days after the passage of this Act, to cause notice of the proposed work to be conspicuously posted in the office of the Superintendent of Public Streets, and also published in the official paper for five days, inviting sealed proposals for the work of grading as designated in section one of this Act." It then directs how the proposals are to be made and opened, and requires the work to be awarded to the lowest responsible bidder, and that within three days after the award the Super-

intendent of Public Streets shall enter into a contract for the work with the successful bidder. This section is plainly mandatory. It leaves no room for the exercise of any discretion by the Board; and negatives emphatically the idea that it was at liberty to decline to cause the improvement to be made.

The last proposition of the counsel is, that because the Board is allowed to exercise a very limited discretion in respect to the details to be observed in the construction of the bridge and stairs, the inference is that it might exercise a similar discretion in respect to undertaking the work at all. The argument is ingenious, but not sound. The bridge and stairs are but incidents to the main work; and though necessary to render the improvement complete, the possible failure of the Board hereafter to do its duty in that respect affords no valid reason why it should decline to commence the work. It cannot be assumed in advance that a majority of the Board will be unable to agree upon such details as are necessary in respect to the bridge and stairs, and if, when the time for action arrives, it should find itself in that unfortunate predicament, the only result would be that this portion of the work would remain unfinished until a less impracticable Board was chosen, or until the Legislature should provide a remedy. But we are unable to perceive on what ground the fact that the Board is clothed with a limited discretion as to the mere details of a small portion of the work can be justly held to establish or tend to prove the proposition that it may, for that reason, decline to proceed with any part of the work.

We are unable to distinguish the principles involved in this case from those settled in *Napa Valley Railroad Company* v. *The Board of Supervisors of Napa County*, 30 Cal. 436, and *The People* v. *The Board of Supervisors of Lake County*, 33 Cal. 487. (See, also, *The People* v. *Board of Supervisors of San Joaquin County*, 28 Cal. 229; *French* v. *Teschemacher*, 24 Cal. 518; *People* v. *Coon et al.*, 25 Cal. 641; *People* v. *Board*

*of Supervisors, etc.*, 21 Cal. 668; *People* v. *Common Council of Brooklyn*, 22 Barb. 412.)

The only point remaining to be considered is whether the application for the writ is properly made in the name of the People, or should have been made in the name of the relator, or some one else directly interested in the proposed improvement. In the notice for this application, and in the affidavit of the relator, on which the application is in part founded, the title of the cause is given as " *The People of the State of California, upon the relation of John Ferguson* v. *The Board of Supervisors of the City and County of San Francisco.*" But it is not specified in the notice that the application will be made for or on behalf of the People, but only that an application will be made " for a peremptory writ of mandate to and upon your honorable body, directing and requiring you to do and perform the various acts and duties enjoined upon your honorable body," in the "Act of the Legislature of the State, entitled," etc., giving the title and date of the Act. It also specifies that the application will be made on the annexed affidavit of the relator, on the said Act, and the minutes of the Board. The notice is signed only by counsel for the relator, and not by the Attorney General. The affidavit of the relator shows that he is the owner of real estate within the limits to be benefited by the improvement, and is beneficially interested therein. Though the Attorney General did not sign the notice, he unites in the brief in support of the application, and thereby, impliedly at least, consents to the use of the name of the People. The counsel for respondents relies on the case of *The People* v. *Pacheco*, 29 Cal. 213, as establishing the proposition for which he contends. But in that case it affirmatively appeared not only that the People had no interest in the contest, but that the relator had no authority from the Attorney General to use the name of the People; whereas in this case the Attorney General must be held as assenting to the use of the name of the People, and it is apparent from the very nature of the case that a large number of persons are interested in the

result of the application. We are not inclined to extend the principles adjudicated in *People* v. *Pacheco*, on this point, beyond the facts of that case.

Our conclusion is that a peremptory writ of mandate should issue, as prayed for, and it is so ordered.